**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.  4:09CR297** |
| | ) | |
| Plaintiff, | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| v. | ) | |
| | ) | |
| **TAWAYME S. JETT,** | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court upon a Motion to Suppress Evidence filed by the Defendant Tawayme S. Jett ("Defendant").  (Dkt. # 15).

**I. BACKGROUND**

    **A. Procedural Background**

The Government filed the Indictment in the instant matter on June 23, 2009, charging the Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); one count of possession with intent to distribute crack cocaine, in violation of 28 U.S.C. §§ 841(a)(1) and (b)(1)(A); and one count of possession with intent to distribute cocaine, in violation of 28 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (Dkt. # 1).  The Defendant entered a plea of not guilty to each count of the Indictment.  The Court held a hearing on the Defendant's Motion to Suppress on October 21, 2009, and the parties have submitted post-hearing briefs.  (Dkt. # 19, 20, 21).

    **B. Factual Background**

The Defendant was arrested on June 4, 2009, during the execution of two arrest

warrants issued for another individual, Phillip G. Tunanidas ("Tunanidas"). Youngstown Police Officer Robert Giovanni testified that, prior to attempting to execute the warrants, he attempted to locate Tunanidas as part of Operation Falcon, a concerted effort to locate fugitives in the greater Youngstown area. (Tr. at 3-4). Officer Giovanni explained that he used OHLEG,[1] criminal histories, places of arrest, and ChoicePoint[2] to attempt to determine Tunanidas' most recent address. (Tr. at 5). Officer Giovanni further stated that he believed that such information regarding Tunanidas was last checked on May 26, 2009. (Tr. at 5). Officer Giovanni also testified that the warrants for Tunanidas, which were issued in December 2007 and January 2008, both listed Tunanidas' address as 1334 Republic Avenue in Youngstown, Ohio. (Tr. at 6). This address was also listed as the most current address available for Tunanidas through ChoicePoint, though Officer Giovanni testified that the listing of an address on ChoicePoint does not necessarily indicate that an individual had ever actually lived at such address. (Tr. at 6-7).

Based upon the information they had collected, officers made several attempts to confirm Tunanidas' presence at 1334 Republic Avenue, as well as to rule out other possible addresses, prior to the June 4, 2009, execution of the warrants. Officer Giovanni testified that officers were at the address on several occasions but never received a response. (Tr. at 9). On one occasion, officers spoke with a next door neighbor who could not positively identify Tunanidas from a photo, but stated that "several white guys

---

[1] OHLEG (Ohio Law Enforcement Gateway) is an Ohio law enforcement database for identifying individuals based upon drivers' licenses, vehicle registrations, and other records.

[2] According to Officer Giovanni, ChoicePoint is "an information service that the Marshal Service contracts with. It uses credit reports, phone records, house, cars…to compile most likely addresses and time frames when they are used." (Tr. at 5).

2

who looked like that description" had been at the house.  (Tr. at 9).  Additionally, Officer Giovanni testified that 1334 Republic Avenue did not belong to Tunanidas, but to a female by the last name of "Williams."  (Tr. at 9).  Officer Giovanni stated that, based upon this information, he still believed that 1334 Republic Avenue was a current address for Tunanidas.  (Tr. at 10).

  Officers attempted to execute the two arrest warrants at 1334 Republic Avenue on June 4, 2009.  Upon arriving at the house, Deputy United States Marshal Keith Yauger, along with Ohio State Troopers Eli Rivera and Mike Landers, approached the front door of the residence and found that the main entry door was open, but a heavy duty screen door was closed and locked.  (Tr. at 22, 24, 47).  The officers heard music or a television on inside the house.  (Tr. at 22, 47).  Deputy Marshal Yauger banged on the screen door and identified the officers.  (Tr. at 47).  After a few moments, the Defendant answered the door.  Officer Rivera testified that the Defendant "appeared to be very evasive."  (Tr. at 25).  Officer Rivera stated that the Defendant, when asked, denied that Tunanidas was in the house and then closed the door.  (Tr. at 25).  Deputy Marshal Yauger, however, testified that the Defendant came to the door and slammed the door in the officers' face.  (Tr. at 47).  Officer Rivera testified that as the door was closing, he observed the Defendant "head back towards the area of the house to [the officer's] left."  (Tr. at 26).

  Deputy Marshal Yauger then directed Officer Rivera to get a ram from a police van in order to force the door open and gain entry into the home.  (Tr. at 26, 47).  Before Officer Rivera returned with the ram, however, the Defendant had reopened the main entry door and was speaking with Deputy Marshal Yauger.  When Officer Rivera

3

approached with the ram, the Defendant unlocked and opened the outer screen door, according to Officer Rivera, "because he knows I am going to bend the door, I am going to get inside the residence." (Tr. at 26-27, 47-48). At that point, Officer Rivera moved the Defendant from the doorway to the porch and other officers entered the home. (Tr. at 27-28). Though the Defendant was not handcuffed, Officer Rivera testified that he was not free to leave at that point. (Tr. at 28). Officer Rivera then showed the Defendant a photo of Tunanidas. The Defendant stated that he did not know Tunanidas and that Tunanidas had never lived in the house. (Tr. at 28).

Ohio State Trooper Justin Daley testified that he was one of the officers that entered the house after the Defendant was moved to the porch. He stated that he had initially been positioned on the side of the house, but came to the front when he "heard the commotion that was going on up at the front door." (Tr. at 35). Officer Daley testified that a total of four to five officers entered the house to look for Tunanidas, "or basically [to conduct] a protective sweep because of the way the [Defendant] reacted when [officers] initially approached the house."[3] (Tr. at 36). Upon entering, Officer Daley turned left inside the front door and proceeded into the basement, where he discovered a firearm under the stairs and what appeared to be cocaine scattered on the floor. (Tr. at 37). He then went back upstairs into the kitchen and observed a scale and plastic baggies on the counter, along with a pot of boiling water on the stove. (Tr. at 37). Officer Daley testified that he and other officers found the upstairs area of the house to be

---

[3]  The government has not argued that the search was justified as a protective sweep under Maryland v. Buie, 494 U.S. 325 (1990).

"completely bare."  (Tr. at 38).

After conducting their initial search of the house, the officers returned to the front porch to report what they had found.  (Tr. at 38).  At that point, Officer Rivera and others began calling other law enforcement, including Officer Giovanni and Special Agent Nicholas Vouvalis of the Bureau of Alcohol, Tobacco, and Firearms, to come to the house.  (Tr. at 10, 38, 42-43).  Officer Daley and others then reentered the house to photograph the basement area where evidence had been discovered, and to test the substance found on the basement floor, which tested positive for cocaine.  (Tr. at 38-39).  The officers then exited and secured the residence until additional law enforcement arrived.  (Tr. at 39).

When Officer Giovanni arrived at the house and was briefed as to what had been discovered, he contacted the Youngstown Vice Unit.  (Tr. at 10).  Officer Giovanni testified that an officer from the Vice Unit then applied for a search warrant for the property, which was ultimately issued.  (Tr. at 11).  Special Agent Vouvalis participated in the execution of the search warrant.  (Tr. at 43).  He testified that he observed several pieces of mail addressed to Tunanidas at 1334 Republic Avenue, as well as several pieces of mail addressed to the Defendant at the same address.  (Tr. at 43).  He also observed the Defendant's Ohio driver's license, which listed a Youngstown address other than 1334 Republic Avenue.  (Tr. at 43-44).  All of the evidence, including the firearm, drugs, and drug paraphernalia, was collected from the house.  Tunanidas was not found in the house.  (Tr. at 37).

5

**II. LAW AND ANALYSIS**

In his Motion to Suppress Evidence, the Defendant argues that the evidence seized, namely the drugs, drug paraphernalia, and weapon, was obtained as a result of an illegal entry into his home and should be suppressed.  "'It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression.'"  United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting United States v. Feldman, 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  The warrant requirement protects against unreasonable intrusions by government agents by ensuring: (1) that a neutral and detached officer of the judiciary measure the probable cause asserted; and that (2) "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  See also Johnson v. United States, 333 U.S. 10, 14 (1948) ("The point of the Fourth Amendment…is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

It is undisputed that officers in the instant matter had two valid arrest warrants for

6

Tunanidas. The United States Supreme Court held in Payton v. New York, 445 U.S. 573, 603 (1980), that, "[f]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Based upon this holding, the Sixth Circuit observed in United States v. Buckner, 717 F.2d 297, 300 (6th Cir. 1983), that the police do not violate a suspect's Fourth Amendment rights when they enter his home "if they [have] a warrant for his arrest and reason to believe that he [is] inside." Therefore, absent consent or exigent circumstances, police may enter a suspect's home to execute an arrest warrant if they possess two things: (1) an arrest warrant for that suspect, and (2) reason to believe that the suspect is inside.[4]

Payton and the widely-applied "reasonable belief" standard do not require officers to be certain that the subject of an arrest warrant resides in the home to be searched. Moreover, officers need not be correct as to the suspect's residence in the home. Valdez

---

[4] Circuits are split on what standard applies to the Supreme Court's "reason to believe" language. Of the circuits that have decided the issue, only the Ninth Circuit has held that such language requires probable cause to believe the suspect is inside a particular home at a particular time. See United States v. Gorman, 314 F.3d 1105, 1111-15 (9th Cir. 2002). All other circuits that have decided the issue have held that "reason to believe" is a standard less than probable cause, which requires only a reasonable belief that the suspect is inside. See United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996).

The Sixth Circuit, while acknowledging a circuit-split on the issue, at least suggested in United States v. Pruitt, 458 F.3d 477, 482-83 (6th Cir. 2006), that the "reason to believe" language employed by the Supreme Court in Payton requires less than probable cause. The Court stated that "an arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest is within the residence at that time." Id. at 483.

A panel of the Sixth Circuit in United States v. Hardin, 539 F.3d 404, 411 (6th Cir. 2009), however, found the adoption of the "reasonable belief" standard in Pruitt to be dicta because it was unnecessary for the determination of the issue on appeal. The Hardin Court declined to adopt either probable cause or reasonable belief as the standard for determining whether police may enter a residence to execute a search warrant. Though the Court found a decision on the issue unnecessary, it did assume for purposes of the analysis that, consistent with a majority of circuits, the lesser reasonable belief standard applied. Id. at 420.

v. McPheters, 172 F.3d 1220, 1224-25 (10th Cir. 1999).  Except for the Ninth Circuit, every circuit to address the issue has held that all Payton requires is a reasonable belief that the suspect resided in the home and could be found there at the time of the search. See Id. (collecting cases).[5]

The information known to officers at the time of the search in the instant matter, however, was not sufficient to support a reasonable belief as to either fact.  Despite their efforts, officers were never able to confirm that Tunanidas lived at 1334 Republic Avenue at the time of the search.  The home was did not belong to Tunanidas.  (Tr. at 9). Officer Giovanni testified that, although the home was listed on ChoicePoint as an address for Tunanidas, such listing does not necessarily indicate that Tunanidas had ever actually lived at that address.  (Tr. at 6-7).  On several occasions, officers received no response at the address when they attempted to confirm Tunanidas' residence there.  (Tr. at 9).  When shown a photo of Tunanidas, a neighbor could not positively identify him as a resident in the home.  (Tr. at 9).  In short, nothing besides the ChoicePoint listing and two 17-month-old arrest warrants indicated that Tunanidas lived at 1334 Republic Avenue.[6]

---

[5] The Defendant has gone to great lengths to point out that Tunanidas was actually incarcerated in Pennsylvania on the date of the search in the instant matter.  The Court finds this fact, even if true, to be irrelevant.  If the evidence were such that the officers could have had a reasonable, though mistaken, belief that Tunanidas resided at 1334 Republic Avenue, his actual incarceration, if unknown to the officers, would not preclude a finding that the search was lawful.

[6] With respect to the second Payton requirement, there is no evidence that the officers had any reason to believe, based upon common sense factors and the totality of the circumstances, that Tunanidas was inside the house at the time they entered.  See Pruitt, 458 F.3d at 482-483.  The officers did not rely on surveillance, time of day, informants' tips, or any other information to support a belief that Tunanidas was in the home on June 4, 2009.  Id. at 483 (collecting cases in which evidence supported officers' belief that suspect was in the home to be entered).  In fact,

8

Because it was never established that Tunanidas resided at 1334 Republic Avenue, Payton does not control the analysis. That is, Payton only permits entry into a suspect's own home based upon an arrest warrant for that particular suspect. The evidence before the Court suggests, and the government has not disputed, that the Defendant did, in fact, reside at 1334 Republic Avenue at the time of the search. Where the home to be entered and searched is that of a third party not named in an arrest warrant, the analysis is different.

Absent consent or exigent circumstances, neither of which is present in the instant matter, an arrest warrant for an individual does not authorize police to enter the residence of a third party to search for the suspect named in the warrant. Steagald v. United States, 451 U.S. 204, 213-216 (1981). In Steagald, Drug Enforcement Agency agents received information from a confidential informant that Ricky Lyons, the subject of a 6-month-old arrest warrant, could be reached at a particular phone number during the subsequent 24-hour period. Through phone company records, agents obtained the address corresponding to that phone number. Four days after the anonymous tip was obtained, agents went to the address to search for Lyons. Approaching with guns drawn, they found Steagald and another man, neither of whom were Lyons, standing outside the house. After securing the men, agents proceeded to the house, where one of the men's wives answered the door and stated that she was alone in the house. She was secured and one agent entered and searched the home. Lyons was not found, but the agent discovered

---

when they approached the house on June 4, 2009, the Defendant answered the door and stated that Tunanidas was not present. (Tr. at 25). Based upon the evidence, officers had no reason to believe otherwise.

what appeared to be cocaine. Agents then obtained a search warrant for the home and eventually recovered forty-three pounds of cocaine. Steagald was arrested and indicted on drug charges. His motion to suppress the drug evidence was denied by the district court and affirmed by the Fifth Circuit. Id. at 206-07.

The Supreme Court reversed, finding that the entry and search of Steagald's home based upon the Lyons arrest warrant violated Steagald's Fourth Amendment rights. The Court framed the issue as:

> whether an arrest warrant – as opposed to a search warrant – is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances.

Id. at 212. Noting that "while the warrant in [the] case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect [Steagald's] privacy interest in being free from an unreasonable invasion and search of his home," the Court held that, absent exigent circumstances or consent, a search warrant is required for police to enter the home of a third party to search for the subject of an arrest warrant. Id. at 211-216. Absent a search warrant, any evidence found in the home is inadmissable against the third party. Id.; see also United States v. Hardin, 539 F.3d 404, 411 (6th Cir. 2009) (recognizing Steagald's overruling of United States v. Jones, 641 F.2d 425 (6th Cir. 1981) on the issue).

In the instant matter, because officers did not have a search warrant for the Defendant's residence, their entry and search based upon the Tunanidas arrest warrants violated the Defendant's Fourth Amendment rights against unreasonable search and

seizure. Accordingly, the evidence seized as a result of the search, namely the firearm, drugs, and drug paraphernalia, must be suppressed.

### III. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant's Motion to Suppress Evidence. (Dkt. # 15).

Furthermore, after full consideration of the factors set forth in 18 U.S.C. § 3161(h)(8)(B), this Court finds that the ends of justice served by continuing the trial in the instant matter outweigh the best interests of the public and the Defendant in a speedy trial.

Accordingly, this Court hereby continues the **TRIAL** to February 2, 2010, at 8:30a.m. The final pretrial conference shall be held on January 19, 2010, at 9:00a.m.

**IT IS SO ORDERED.**

                                        **/s/ Peter C. Economus – November 20, 2009**
                                        **PETER C. ECONOMUS**
                                        **UNITED STATES DISTRICT JUDGE**